**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**WILLIAM CECIL BAXTER,**

      **Plaintiff,**

**vs.**                                                   **Case No. 4:09cv74-SPM/WCS**

**CLIFFORD ADAM, et al.,**

      **Defendants.**

_____/

## REPORT AND RECOMMENDATION

Plaintiff, a state prisoner proceeding *pro se*, filed a second amended complaint under 42 U.S.C. § 1983, doc. 21, and service was directed.  Plaintiff's claims concern his need for a special shoe and treatment for his partially amputated left foot.  *Id*.

Pending is a motion for summary judgment filed by Defendants Clark, Franklin, and Bennett-Blake.  Doc. 61.  Plaintiff has filed a response.  Doc. 66.  The motion is ready for ruling.

**Allegations of the Second Amended Complaint, doc. 21**

Plaintiff alleges that prison officials at Franklin Correctional Institution and the North Florida Reception and Medical Center (NFRMC) violated his Eighth Amendment

rights.[1]   Plaintiff alleges that when he was processed into the Florida Department of

Corrections on August 29, 2007, he had a partially amputated left foot.  Doc. 21, p. 6.

Plaintiff's high-top boots and prosthetic inserts were taken from him when he entered

the Department of Corrections, causing him problems with a skin graft on that foot, as

well as balance and support issues.  *Id.*  The boots issued to Plaintiff instead of his

"medically necessary" boots caused damage to Plaintiff's skin graft and his back.  *Id.*, at

7-8.  Plaintiff contends Defendants have been deliberately indifferent to the pain he has

endured and the permanent injury to his foot. *Id.*, at 8.

Plaintiff's seeks a declaratory judgment as well as compensatory and punitive

damages.  Doc. 21, p. 8.  Plaintiff also seeks the following types of injunctive relief:

"high-top boots with adequate cushion on tongue and insides of boots in order to

prevent the breakdown of his skin graft; prosthetic inserts to provide standing balance

and support; all corrective surgery and therapy to repair all damage caused to skin graft

and back; and supply" pain medication without requiring a fee for "future sick call visits

or medications resulting from this issue of this claim."  *Id.*

**Procedural Status**

Plaintiff originally named seven persons as Defendants: (1) Clifford Adam, Chief

Health Officer at Franklin Correctional Institution; (2) John Doe at NFRMC; (3) Desreen

Bennett-Blake,[2] Advanced Registered Nurse Practitioner; (4) Kim Clark, Senior Health

---

[1] Plaintiff states that this is his only claim.  Doc. 66, pp. 1-2.  He does not bring a
claim under the Americans with Disabilities Act as a separate claim.  *Id.*, p. 3.

[2] This is the correct spelling of this Defendant's name.  Doc. 61, Ex. F (doc. 61-6,
p. 1).

Services Administrator; (5) Mrs. Franklin, Nurse; (6) Howard McClunney, Brace Clinic Specialist; and (7) Rick Coleman, Brace Clinic Specialist.  Doc. 21.

Service could not be carried out as to the John Doe Defendant, doc. 28, Defendant Adam, docs. 47 and 49, or Defendant McClunney, docs. 54, 56.  Plaintiff voluntarily dismissed his claims against Defendant McClunney.  Docs. 68, 71.  Adams and the John Doe Defendant have never been served.

The following Defendants were served:  Clark, doc. 33; Franklin, doc. 34, Bennett-Blake, doc. 48; and Coleman, doc. 58.  Coleman has only recently filed an answer.  Doc. 80.

## Legal standards governing a motion for summary judgment

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  Id.  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, quoting Anderson v.

Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All

reasonable inferences must be resolved in the light most favorable to the nonmoving

party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a

genuine dispute as to those facts.  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769,

167 L.Ed.2d 686 (2007), *cited in* Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009).

"Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Industrial Co.,

475 U.S. at 587 (internal quotation marks omitted), *quoted in* Ricci v. DeStefano, 129

S.Ct. at 2677.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by

her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v.

Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting*

Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The

nonmoving party need not produce evidence in a form that would be admissible as Rule

56(e) permits opposition to a summary judgment motion by any of the kinds of

evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477

U.S. at 324, 106 S. Ct. at 2553.

**Rule 56 evidence**

It is plain from the medical evidence that Plaintiff has a serious medical need.  I

have set forth a very lengthy review of the evidence here so that I can see clearly the

specific nature of the claims against the three Defendants, and do not fail to see some

aspect of the evidence that should have been seen as it relates to specific claims.

Plaintiff entered the custody of the Department of Corrections on August 20, 2007.  Doc. 61; Ex. B (doc. 61-2, p. 2).[3]  In 1989, Plaintiff had a motorcycle accident resulting in the amputation of half of his left foot.  Doc. 61, p. 3; Ex. C1 (doc. 61-3, p. 1).

During Plaintiff's processing into the Department of Corrections (DOC), his "medically prescribed prosthetic foot insert and boots were confiscated by an unknown officer" and then "disposed of . . . ."  Doc. 66, Plaintiff's Statement of Facts, p. 1 (p. 25).[4]  Plaintiff was "given a pair of size 10 state issue slip-ons (bo bo's) which in no way conform to amputation, have any padding, or provide any support."  *Id.*  By the time Plaintiff had walked approximately 600 yards to his confinement area, his "skin grafts were torn and bleeding" and he was in pain.  *Id.*  Plaintiff immediately requested to see a doctor.  *Id.*  Plaintiff asserts:  "Days later, Plaintiff was seen by" an unknown female physician at NFRMC and "given band-aids to cover wound and a pass to get state brogans (boots)."  *Id.*  Plaintiff requested to be seen by a specialist and the doctor told Plaintiff he "would be scheduled to see one at his permanent institution."  Plaintiff's Statement of Facts, pp. 1-2 (pp. 25-26).  The band-aids did not fully cover Plaintiff's wound.  *Id.*, at 2 (p. 26).

Defendants have presented evidence that while at NFRMC, Plaintiff sought medical care on September 14, 2007, requesting something to cushion his "deformed

---

[3] Hereafter, all references to exhibits are to those attached to document 61, unless otherwise noted.  References are to the paper copy and page number, followed by a reference (in parenthesis) to the corresponding document and page in the electronic docket.

[4] Attached to doc. 66 is Plaintiff's Statement of Facts.  It is a 17 page document, and has been assigned pages 25-41 on the electronic docket.  Citations will be first to the paper page number followed by the page number assigned by the electronic docket.  The statement of facts is under oath.  Statement of Facts, p. 17 (doc. 66, p. 41).

foot" and an ace bandage wrap.  Doc. 61, p. 3; Ex. C2 (doc. 61-3, p. 2).  The medical

record indicates that he had problems with this issue for "years."  *Id.*  No acute distress

was noted in the examination, and Plaintiff walked with a steady gait.  *Id.*  He was given

an ace wrap to help cushion his deformed foot, prescribed Motrin (400 mg.) for pain,

and advised to "rest foot when" he could."  *Id.*  Plaintiff was told to come back to the

clinic if needed.  *Id.*  At that time, Plaintiff was then wearing "state boots."  *Id.*  Plaintiff's

version of this visit is the following.  He states that when he was released form

confinement on September 14, 2007, he was given a "pair of size 10½ state brogans,

that had no padding and obviously did not conform to his amputation."  Plaintiff's

Statement of Facts, p. 2 (p. 26).  Within an hour of wearing them, Plaintiff had "open

abrasions on the skin graft and was experiencing extreme pain."  *Id.*  Plaintiff states that

he sought medical help two more times while he was at NFRMC and both times, he

"was supplied with ointment and band-aids."  *Id.*  Plaintiff said the delicate nature of the

skin was "so visible even a layperson could give an adequate diagnosis."  *Id.*  Plaintiff

asked for "padding and prosthetic" and states that "band-aids in no way whatsoever

address the problem."  *Id.*

Plaintiff returned on September 26, 2007, complaining of "foot pain" and asking

for a pair of shoes because his boots were rubbing his skin graft.  Doc. 61, p. 3; Ex. C3

(doc. 61-3, p. 3).  It was noted that Plaintiff had no redness, edema or skin breaks, but

Plaintiff was provided an "insole pass" for two weeks and given Ibuprofen (400 mg).  *Id.*

The notation on his medical record states, "Get special shoes @ permanent camp."  *Id.*

Plaintiff was transferred to Franklin Correctional Institution and went to sick call

on October 4, 2007.  Doc. 61, p. 3; Ex. C4 (doc. 61-3, p. 4).  Plaintiff complained of

sores that had been on his foot for several days, and Nurse Franklin's examination

revealed "2 very small" (1/4 cm) open lesions on the top area of his left foot, but without

swelling or redness.  *Id.*  Plaintiff was provided Bactrim[5] and band-aids for his foot, and

told to keep the area clean and dry.  *Id.*  Plaintiff's version is that he sought medical

treatment during processing into Franklin Correctional Institution on October 3rd, but

was told to use sick call, which he did the following day.  Plaintiff's Statement of Facts,

p. 2 (p. 26).  Plaintiff asked to see a doctor to replace his prosthetic aids and treat the

"open abrasions caused by State boots."  *Id.*  Plaintiff was again "given more band-aids

and ointment which did nothing to alleviate or correct the problem."  *Id.*

On October 15, 2007, Plaintiff was examined by Defendant Bennett-Blake for

complaints about his foot pain and the open sore areas.  Doc. 61, pp. 3-4; Ex. C5 (doc.

61-3, p. 5).  Plaintiff said that he previously "had Timberline boots with diabetic cushions

in them."  *Id.*  Defendant Bennett-Blake documented Plaintiff's request for special shoes

and pain medication.  *Id.*  She also noted Plaintiff's foot was "grossly deformed,"

Plaintiff's big toe and second toe were missing, and he had a skin graft on the medial

aspect of his left foot.  *Id.*  Defendant Bennett-Blake recommended that Plaintiff be

referred to the Brace Clinic if given approval from Dr. Adam.  *Id.*  The abrasion on

Plaintiff's foot was treated with Bacitracin and band-aids, and he was given extra

bandages.  *Id.*  Plaintiff was also provided Motrin (600 mg) for pain.  *Id.; See also*

Bennett-Blake affidavit.

---

[5] Bactrim is a trimetheprim-sulphamethoaxozole used to treat the bacterial
infection commonly known as MRSA (a methicillin-resistant staphylococcus aureus).
Doc. 61, p. 3, n.2.

The next day, Defendant Bennett-Blake signed a request for a consultation at the brace clinic; the request was approved by Dr. Adam.  Doc. 61, p. 4; Ex. C6 (doc. 61-3, p. 6).  That request noted Plaintiff was complaining of "severe pain" in his left foot "caused by the old injury and the Brogan" state-issued boots squeezing against his left foot.  *Id.*

Plaintiff was examined at the Brace Clinic on December 14, 2007, where he was fitted with and given a pair of "Dr. Comfort" hightop boots, size 10 1/2.[6]  Doc. 61, p. 4; Ex. C7, C8 (doc. 61-3, pp. 7-8).  On the form to acknowledge receipt of the therapeutic shoes, the reason for providing the shoots was "significant deformities."  Doc. 61, Ex. C8 (doc. 61-3, p. 8).  Plaintiff says that he was examined at the Brace Clinic by Howard McClunney.  Plaintiff's Statement of Facts, p. 3 (p. 27).  Plaintiff asserts that Mr. McClunney issued Plaintiff a "pair of high top boots with no padding or prosthetic insert, essentially equal to State issued brograns."  *Id.*  Plaintiff complained about the boots to Mr. McClunney, but Mr. McClunney informed Plaintiff "that Mrs. Bennett-Blake wrote boots on referral slip and that was all he would do."  *Id.*  He advised Plaintiff to "soak them in hot water and wear them until they dry" to get a better fit from the boots, or take it up with Mrs. Bennett-Blake when he returned to Franklin CI.  *Id.*

Plaintiff states that on December 26, 2007, he sent a request to ask for pain medication and to report what happened at the Brace Clinic.  Plaintiff's Statement of Facts, P. 3 (p. 27).  Plaintiff was told to go to sick-call for his needs.  *Id.*

Plaintiff returned to sick call on January 29, 2008, complaining that the Dr. Comfort boots hurt and rubbed his "feet causing sore spots."  Doc. 61, p. 4; Ex. C9

---

[6] Dr. Comfort foot wear is designed for the diabetic foot.  Doc. 61, p. 4, n.3.

(doc. 61-3, p. 9).  The nurse's observation was that the foot was "very deformed" and had "some red rubbed areas on top" of his foot near his toes and ankle.  *Id.*  Plaintiff was given Ibuprofen and band-aids, and a recommendation was made for Plaintiff to see a physician for possible orthopedic shoes.  *Id.*

On February 11, 2008, Plaintiff returned to sick call with complaints of an open blister on the top of his foot, soreness, and shoulder pain from a fall.  Doc. 61, p. 4; Ex. C10 (doc. 61-3, p. 10).  The notes indicate that Plaintiff had a half open area on the top where the shoe was rubbing.  *Id.*  There were no signs or symptoms of infection and Plaintiff was given Bactrim, Ibuprofen, and received a cane pass and provided a bed rest lay in.  *Id.*  Plaintiff's shoulder had full range of motion.  *Id.*

Plaintiff was seen by Dr. Adam on February 14, 2008, with complaints of foot ulcers.  Doc. 61, pp. 4-5; Ex. C11 (doc. 61-3, p. 11).  Dr. Adam ordered Naproxen for 90 days, Betadine and Bacitracin for 3 days, and provided a lay-in pass for 3 days.  *Id.*  A notation in the records also indicates Plaintiff should have a follow-up appointment.  *Id.*  Dr. Adam also made a subsequent notation that Plaintiff was "very demanding, stated that he didn't trust anybody" and said he was going to tighten his shoes "properly" to get some sores on his foot.  Doc. 61, p. 5; Ex. C12 (doc. 61-3, p. 12).  Plaintiff said if he had no sores, he would never get the "proper shoes."  *Id.*  Dr. Adam advised Plaintiff not to try and hurt himself.  *Id.*  Plaintiff's description of this encounter with Dr. Adams is that Dr. Adam also made "a procedure requisition to have Plaintiff's partially amputated left foot X-rayed for his file."  Plaintiff's Statement of Facts, p. 3 (p. 27).  He also requested an unknown Nurse and Defendant Bennett-Blake "view Plaintiff's amputation."  *Id.*  Plaintiff asserts that Defendant Bennett-Blake "acknowledged Plaintiff's amputation,

then advised Dr. Adam that Plaintiff had just been sent to [the] Brace Clinic and he could not go back for 1 year." *Id.* Plaintiff also alleges that Nurse Practitioner Bennett-Blake said, "He has to deal with it for 1 year." *Id.* Plaintiff contends that Defendant Bennett-Blake "also advised Dr. Adam not to X-ray amputation because it did not happen in DOC." *Id.* Plaintiff reports trying to explain what Mr. McClunney had told him, but he asserts that Dr. Adam tore up all the "paperwork he had filled out during his examination," and told Plaintiff "not to bother them again for a year and if Plaintiff needed help before then to 'ask God for it.' " *Id.* It is uncertain what Plaintiff means as it is obvious that the medical notes prepared by Dr. Adam from February 14, 2008, still exist, are in this record, and are described above.

Plaintiff returned to sick call two weeks later on February 25, 2008, complaining of a sore on his foot and advising that he did not need the cane. Doc. 61, p. 5; Ex. C13 (doc. 61-3, p. 13). A small red area was noted on the inner portion of his left foot, but the skin was intact. *Id.* Plaintiff was provided band-aids, advised on pain control and the use of heat and cold, and told to return if the area opened up. *Id.*

Plaintiff did return approximately a month later, on March 21, 2008, complaining of sores on his foot and requesting cushioned boots. Doc. 61, p. 5; Ex. C14 (doc. 61-3, p. 14). Plaintiff also said that the boots were hurting his back and his right knee. *Id.* The medical records note Plaintiff "present[ed] with sock with a panel sewed on top." *Id.* Plaintiff had "positive pedal pulse," no signs of infection, and was given band-aids and antibiotic medication for the area. *Id.* Plaintiff was advised to return to the clinic if there was no improvement, and Plaintiff was to be referred to the physician. *Id.* Plaintiff, however, reports that during this visit, Nurse Riley told him that "the doctor

refused to see him about his partially amputated foot problem."  Plaintiff's Statement of Facts, p. 4 (p. 28).

Plaintiff also states that Nurse Riley read Plaintiff the statement Dr. Adam wrote in Plaintiff's file on March 14, 2008.  Plaintiff's Statement of Facts, p. 4 (p. 28).  Plaintiff wrote a request to see Dr. Adam about "how Dr. Adam was attempting to blame Plaintiff for causing damage to his skin graft."  *Id.*

Defendant Bennett-Blake examined Plaintiff again on March 27, 2008.  Doc. 61, p. 5; Ex. C15 (doc. 61-3, p. 15); *see also* Bennett-Blake affidavit.  Plaintiff complained that the boots he was given from the Brace Clinic were hurting, caused sores on this fee, and rubbed the skin grafts.  *Id.*  Plaintiff said the boots did not support his feet and ankles properly, creating pain in his lower back and hip and knee pain.  *Id.*  Defendant Bennett-Blake noted no distress, but Plaintiff had a few abrasions on his left foot.  *Id.*  Defendant Bennett-Blake recommended that Plaintiff be referred to the Brace Clinic for an evaluation of the boot.  *Id.*  She treated the abrasions with Bacitracin and bandages.  *Id.*  Plaintiff reports that Defendant Bennett-Blake "refused to discuss any paperwork in Plaintiff's file and stated Dr. Adam would not see Plaintiff."  *Id.*  On that same day, Defendant Bennett-Blake submitted another request for a consultation to the Brace Clinic at NFRMC, noting Plaintiff's complaints about the boots he had received in December.  Doc. 61, p. 5; Ex. C16 (doc. 61-3, p. 16); *see also* Bennett-Blake affidavit.  The request for consultation noted that Plaintiff had been complaining that the boots were causing sores on his feet, rubbing his feet over the area of the skin graft, and causing knee and back pain.  *Id.*  She wrote: "Please evaluate situation."  *Id.*  An appointment date was set for July 10, 2008.  *Id.*

Plaintiff sent a request on May 18, 2008, "begging to see a doctor about pain medication and specialist appointment." Plaintiff's Statement of Facts, p. 5 (p. 29). On May 22, 2008, Plaintiff was placed on a callout to see Dr. Adam. *Id.* At the follow-up visit with Dr. Adam on May 22nd, Plaintiff complained of a sore on his left foot; he said that Ibuprofen worked better for him than the Naproxen and asked to be changed back. Doc. 61, p. 6; Ex. C17 (doc. 61-3, p. 18). Dr. Adam gave Plaintiff a prescription for Ibuprofen (600 mg) and directed him to follow up as needed. *Id.; see also* Plaintiff's Statement of Facts, p. 5 (p. 29). At that time, Dr. Adam changed the referral request from "routine" to "urgent." Plaintiff's Statement of Facts, p. 5 (p. 29).

Plaintiff went to medical again on May 28, 2008, for "more band-aids and ointment and to find out about [his] appointment at Brace Clinic." Plaintiff's Statement of Facts, p. 5 (p. 29). Defendant Franklin told Plaintiff there "was no paperwork in Plaintiff's file about a referral to Brace Clinic." *Id.* After having his grievance and grievance appeal denied, Plaintiff was placed on a call-out for mental health on June 20, 2008. *Id.* While in the waiting room, Senior Health Services Administrator at Franklin Correctional Institution Kim Clark asked Plaintiff to come to her office. *Id.* When Plaintiff arrived, she asked him what his problem was and Plaintiff said he had been "waiting on an appointment for Brace Clinic for 11 weeks and due to a statement made by Nurse Franklin . . . he did not think they had sent the referral form from 3/27/08 to Brace Clinic." *Id.* Defendant Clark looked in Plaintiff's file and did not find a referral. *Id.* Plaintiff asked her to look through all the forms to see if it had been misplaced, and Defendant Clark eventually "found referral form in back of file, then proceeded to use her computer for approximately 3-5 minutes." *Id.* Defendant Clark spoke with Plaintiff

about the referral and Plaintiff asked her to look at the damage to his foot. *Id.* She replied that she was not a medical doctor, and while they were talking, her computer beeped, and she turned around to read a message. *Id.* Defendant Clark then told Plaintiff he had an appointment very soon, but could not tell Plaintiff when it would be. *Id.*, pp. 5-6 (pp. 29-30).

Plaintiff was seen at the Brace Clinic on July 10, 2008. Doc. 61, p. 6; Ex. C16A (doc. 61-3, p. 17). The "Findings" on the consultant's report at the Brace Clinic noted Plaintiff had a history of use of Spot-Bilt boots, and currently was wearing Dr. Comfort boots which were "causing sign irritation at skin graft area on medial mid foot." *Id.* Plaintiff expressed a desire for new Spot-Bilt boots and a recommendation was made to order size 10 1/2 D Spot-Bilt boots for Plaintiff. *Id.* Plaintiff would be rescheduled to fit the boots after they arrived. *Id.* Plaintiff reports that he saw Mr. Coleman at the Brace Clinic on July 10th, who "informed Plaintiff he was being ordered a pair of size 10½ Spot-Bilt boots; that was all the State would pay for . . . ." Plaintiff's Statement of Facts, p. 6 (p. 30). Mr. Coleman said that the boots "would be shipped to Plaintiff in about 6 weeks." *Id.*

Plaintiff returned to sick call on July 28, 2008, asking for Ibuprofen for his foot pain, sun block, and insoles. Doc. 61, p. 6; Ex. C18 (doc. 61-3, p. 19). Plaintiff was given size 10 insoles, sun block, and ibuprofen, and advised to watch for the callout to be fitted for the new boots. *Id.*

Plaintiff reported to sick call on August 3, 2008, asking for pain medication. Plaintiff's Statement of Facts, p. 6 (p. 30). Plaintiff states that he did not receive any pain medication. *Id.* Plaintiff asserts that on August 25, 2008, he sent a request to

either Dr. Adam or Defendant Bennett-Blake asking about pain medication and the

boots that were ordered.  *Id.*  He asserts that on the following day, the request was

returned with the reply, "There is no other way to get to Medical' you must use proper

procedure."  *Id.*  Plaintiff was told he would get a "call out" when his boots arrived.  *Id.*

Plaintiff was seen by Defendant Bennett-Blake on September 2, 2008, as a

"follow up" to the consult request.  Doc. 61, p. 6; Ex. C20 (doc. 61-3, p. 21).  Plaintiff

said he had gone to the Brace Clinic on July 10th, but still had not received the boots

that were ordered for him.  *Id.*  Plaintiff also asked to have his Ibuprofen refilled.  *Id.*

She noted Plaintiff was not in distress, and that the Brace Clinic said Plaintiff's

appointment would not be scheduled until they called, presumably after the boots

arrived.  *Id.*  NP Bennett-Blake wrote another consult request to the Brace Clinic

concerning the expected boots and requested that Plaintiff be called for fitting.  Doc. 61,

pp. 6-7; Ex. C21 (doc. 61-3, p. 22).

Plaintiff states his understanding that the referral stated, "Plaintiff will be ordered

[S]pot-bilt boots on next visit.  Do not refer him back until asked for."  Doc.66, p. 6 (p.

30).  Plaintiff filed a grievance on September 9, 2008, to the warden at Franklin C.I.  *Id.*

It was denied and returned to him on September 23, 2008, advising Plaintiff that his

"boots were ordered and a follow-up scheduled for fitting."  *Id.*

The consultation request by NP Bennett-Blake is dated for September 2, 2008,

and the date the appointment was made for Plaintiff was September 26, 2008.  Doc. 61,

Ex. C21.  The form indicates two appointments for Plaintiff, one on October 16, 2008,

and another on October 23, 2008.  *Id.*  The request states:  "You stated you would order

10½ D Spotbilt Boot to fit on next visit."  *Id.*  Bennett-Blake states that she is following

up for a fitting of the boots.  *Id.*

On September 18, 2008, Senior Health Services Administrator Clark contacted

Advance Brace to inquire about Plaintiff's boots.  Doc. 61, p. 7; Ex. C22 (doc. 61-3, p.

24).  Clark was advised that Spot-Bilt boots had been discontinued by the company.  *Id.*

An appointment for Plaintiff would be rescheduled and they would possibly order

Plaintiff's boots elsewhere.  *Id.*  Another phone call was made to the Brace Clinic on

September 24th to request a follow-up appointment for Plaintiff at the Brace Clinic.  *Id.*;

*see also* Doc. 61, Ex. D (doc. 61-4, p. 1) (hereinafter "Clark Affidavit").

Plaintiff's appointment to be seen at the Brace Clinic was on October 16th, and

the recommendation was made at that time for Plaintiff to be provided with custom

molded shoes with partial left foot insert.  Doc. 61, p. 7; Ex. C21 (doc. 61-3, p. 23).  The

consultant's report noted that Plaintiff had "paper thin skin" with "skin

irritation/breakdown" and the "skingraft area cause for concern . . . ."  *Id.*  The

recommendation was for "custom molded shoes with partial foot insert (left) to protect

skin [and] deter breakdown."  *Id.*  Plaintiff was advised by Mr. Lang at the Brace Clinic

that if the State approved the request for custom made prosthetic boots, it "would take

months."  Plaintiff's Statement of Facts, p. 7 (p. 31).

Dr. Adam approved Plaintiff's return visit to the Brace Clinic on November 6,

2008, when the footwear was delivered.  Doc. 61, p. 7; Ex. C24 (doc. 61-3, p. 26).  At

the Brace Clinic, a cast and measurements were taken for custom molded shoes and it

was noted that the Clinic would call to schedule once the footwear was completed, in

approximately 4-6 weeks.  *Id.*, Ex. C24C (doc. 61-3, p. 27).  Plaintiff reports that Mr.

Lang at the Clinic advised it takes "6 weeks to build" the custom made boots after they receive the mold.  Plaintiff's Statement of Facts, p. 7 (p. 31).  Plaintiff states that Lang said that he could do nothing to correct the area that was damaged.  *Id.*

Plaintiff went to sickcall on December 15, 2008, asking for something for his foot pain and to have a "no prolonged standing pass."  Doc. 61, p. 7; Ex. C25 (doc. 61-3, p. 28).  Defendant Franklin noted Plaintiff had a "very small pin size skin tear" on his left foot.  *Id.*  Plaintiff was provided a band-aid and Bactrim, and a notation in the record indicates Plaintiff would be referred to a physician concerning the "no prolonged standing" pass.  *Id.*  Plaintiff states that he advised that he was in "constant pain from right knee to base of skull on right side and was having trouble walking, standing, or sitting for any length of time."  Plaintiff's Statement of Facts, p. 8 (p. 32).

Plaintiff returned again on January 13, 2009, to request a "no prolonged standing" pass.  Doc. 61, pp. 7-8; Ex. C27 (doc. 61-3, p. 30).  Nurse Kirkland observed Plaintiff walk with a normal gait without a limp.  *Id.*  She observed that he had not had such a pass before, that there was no indication that he need the pass, and his request was denied.  *Id.*; *see also* Plaintiff's Statement of Facts, p. 8 (p. 32).

On January 15, 2009, Plaintiff was seen in the Brace Clinic and provided his custom molded shoes, but he refused to accept them.  Doc. 61, p. 8; Exs. C28-32 (doc. 61-3, pp. 31-35).  Plaintiff said the left shoe caused "extreme pain" even with the laces wide open and with "zero contact in area of pain dorsal mid foot mid line."  *Id.*, at Ex. C30 (doc. 61-3, p.33).  Plaintiff signed the refusal form.  Ex. 32 (doc. 61-3, p. 35).  Plaintiff reports that when he tried on the boots with Mr. Lang at the Brace Clinic, they "caused excruciating pain."  Plaintiff's Statement of Facts, p. 9 (p. 33).  Plaintiff then

requested that his family be permitted to buy him boots and send him 1 pair a year, but the request was denied. *Id.* Plaintiff asserts that Mr. Lang asked Plaintiff to consider amputation of Plaintiff's foot "and being fitted for a prosthetic leg." *Id.* When Plaintiff asked to be referred to an orthopedic specialist, Mr. Lange told Plaintiff "to access sick-call at his permanent institution." *Id.*

Plaintiff returned to Franklin Correctional Institution and during his processing, asked to see the doctor. Plaintiff's Statement of Facts, p. 9 (p. 33). The medical "screener filled out a referral to see doctor." *Id.* Plaintiff filed several grievances before he was placed on a call-out for February 20, 2009. *Id.*

On February 20, 2009, Plaintiff was examined by Dr. Izuegbu who documented Plaintiff's complaints. Doc. 61, p. 8; Ex. C33 (doc. 61-3, p. 36). He recommended another consultation be written for custom molded shoes. *Id.*, Ex. C34 (doc. 61-3, p. 37). Dr. Izuegbu also believed a change in providers to Williams Orthotics was appropriate and the consultation request was written. Doc. 61, p. 8; Ex. C35 (doc. 61-3, p. 40). The consultation request noted that Plaintiff needed the custom molded shoe with an insert to protect the skin and deter breakdown due to "paper thin skin (skin irritation) skin graft area."[7] Doc. 61, Ex. C34 (doc. 61-3, p. 37). Dr. Izuegbu found Plaintiff "had difficulty in maintaining his balance" and he had "developed back pain due to standing on" his right leg most of the time to keep his weight of the left foot. *Id.* Plaintiff's evidence about this encounter is the following. Plaintiff states that he was

---

[7] The consultant wrote on September 10, 2009: "Inmate has a grossly deformed Lt. Foot that requires immediate attention for proper balance and skin breakdown prevention." Doc. 61, Ex. C34A (doc. 61-3, p. 38).

examined on February 20, 2009, by Dr. "Moses," which is Dr. Izuegbu.[8]  Plaintiff's

Statement of Facts, p. 9 (p. 33).  Plaintiff says that he asked for "a walking cane and a

no prolonged standing pass, at which time Nurse Franklin stated that Mrs. Kirkland had

already addressed this issue."  *Id.*  Plaintiff states that Franklin told Dr. Izuegbu that

Mrs. Kirkland had told him that he would be receiving the custom boots soon and would

not need "them," presumably meaning the cane and standing pass.  *Id.*  Plaintiff told

Defendant Franklin that he had been unable to wear the custom fit boots and "still

needed the cane and pass until different arrangements could be made."  *Id.*  Plaintiff

states that Franklin told Plaintiff to come back to address that issue at sick call.  *Id.*

Plaintiff then asked the doctor about his pain medication and Defendant Franklin then

said they needed to see the next patient.  *Id.*  Plaintiff avers the "whole episode took

less than 7 minutes and no treatment was" provided to Plaintiff.  *Id.*

Plaintiff was examined on February 25, 2009, by P.A. Salvador, who discussed

Plaintiff's problems with him and examined his foot.  Doc. 61, p. 8; Ex. C33 (doc. 61-3,

p. 36).  It was noted again that Plaintiff was "presenting a problem with balance

maintenance due to severe pain" in left foot when standing and bearing weight.  *Id.*

Erythematous (reddened) areas were noted, but no open areas were "found yet."  *Id.*

Plaintiff was issued a low bunk pass and no prolonged standing pass (no longer than 20

minutes) for six months.  *Id.*  Plaintiff states that Dr. Salvador also told Plaintiff that he

"needed a walker . . . and also to be sent to any orthopedic specialist to replace his

prosthetic inserts, buy sufficient boots to provide support, and stop the damage being

---

[8] The name of this physician as reflected on the stamp is "Dr. Moses N. Izuegbu."
*See* doc. 61, ex. C44A.

caused to Plaintiff."  Plaintiff's Statement of Facts, p. 10 (p. 34).  He told Plaintiff to "use patience."  *Id.*

On February 26, 2009, Plaintiff was listed on a call-out to pick up his "no-prolonged standing pass over 20 minutes and also a bottom bunk pass."  Plaintiff's Statement of Facts, p. 10 (p. 34).  On February 27, 2009, Dr. Izuegbu ordered a pair of athletic shoes for Plaintiff.  Doc. 61, p. 8; Ex. C34B (doc. 61-3, p. 39).  Senior Health Services Administrator Clark purchased the footwear for delivery to Plaintiff at his next orthotics appointment.  Doc. 61, p. 8; Doc. 70, Ex. D (corrected affidavit) (doc. 70-1, p. 2).

Plaintiff reports that while he was being examined by Dr. Salvador on March 2, 2009, Defendant Clark entered the room and inspected Plaintiff's foot for the first time. Plaintiff's Statement of Facts, p. 11 (p. 35).  Dr. Salvador went over Plaintiff's treatment plan and Defendant Clark "stated she was ordering Plaintiff a pair of size 11.5 Redwing high-top boots."  *Id.*  Defendant Clark advised the boots would arrive on March 4th, but Plaintiff "would not receive them until the prosthetic inserts were made . . . ."  *Id.*  She also advised that the boots would be "delivered to an orthopedic specialist to insure a proper fit."  *Id.*  Plaintiff requested a walking cane, which he says was denied.  *Id.* Plaintiff also said that he thanked Defendant Clark for helping him with the treatment, and she replied, "Thank the State, they're paying for it; and because of the expense, you can only receive new ones every 4 years."  *Id.*  Plaintiff states that two days later, on March 4th, Plaintiff saw Defendant Clark in the hall talking to Dr. Salvador.  *Id.*  She had a boot box with the Redwing logo on the box.  *Id.*

On March 20, 2009, Plaintiff states that he was transported to the Williams Orthopedic Prosthetic Clinic in Tallahassee "with a pair of Merrell Hiking Boots." Plaintiff's Statement of Facts, p. 11 (p. 35).  Plaintiff's foot was "inspected, photographed, and molded for replacement orthopedic prosthetic inserts."  *Id.*  He was told that "if the State agreed, the inserts would be ready in a week, that the new shoes and inserts should help straighten up his back and hip, and also provide adequate protection for skin graft."  *Id.*  Plaintiff states that he asked about the damage done, and he states that the doctor said "the damage is evident."  *Id.*  Plaintiff states that by April 1, 2009, when he had not received the shoes, prosthetics, and the like, he filed a request to Defendant Clark asking for information.  Plaintiff's Statement of Facts, pp. 11-12 (pp. 35-36).  The response, answered by SRN Snyder, advised that Williams Orthotics was called on March 23rd "to proceed on making Plaintiff's orthotics and that Plaintiff would be called out when they came in."  *Id.*  Plaintiff states that a member of Plaintiff's family called Williams Orthotics on April 9, 2009, and was advised that Plaintiff would have "to come back to their Clinic due to a problem making orthotics."  Plaintiff's Statement of Facts, p. 12 (p. 36).  Plaintiff had a medical call out on April 24, 2009, and was transported to Williams Orthotics to be "fitted for orthotic inserts and was issued those inserts as well as a pair of size 11.5 Goretex Merrell Hiking Boots."  *Id.*

Defendants' evidence for this period is that Plaintiff was examined by staff from Williams on March 10, 2009, resulting in a recommendation that he have a custom molded arch support with a toe filler and tongue padding.  Doc. 61, p. 8; Ex. C36 (doc. 61-3, p. 41).  On March 23, 2009, P. A. Salvador approved the refitting of custom molded arch support and toe filler.  Doc. 61, p. 9; Ex. C37 (doc. 61-3, p. 43).  On April

10, 2009, the consultant recommended a custom molded arch support and toe filler, and made a temporary cushion insole.  Doc. 61, Ex. C34A (p. 38).  On April 24, 2009, Plaintiff received the custom arch support and toe filler from Williams Orthotic.  Doc. 61, p. 9; Ex. C38-39 (doc. 61-3, pp. 44-45).  Plaintiff reported that "it felt good."  Doc. 61, p. 8; Ex. C36 (doc. 61-3, p. 41).

On April 28, 2009, Plaintiff returned to sick call complaining that he had received his new orthopedic shoes, but they were making his feet hurt and there were two small open areas were noted on his left foot.  Doc. 61, p. 9; Ex. C40 (doc. 61-3, p. 46).  Plaintiff was given two moleskin patches and advised to keep the area clean and dry.  *Id.*  Plaintiff asserts that he was treated by Nurse Franklin and Nurse Kerstion on that visit.  Plaintiff's Statement of Facts, p. 12 (p. 36).  Plaintiff reports they gave him "4 band-aids and 2 pieces of mole skin."  *Id.*  He states that Nurse Kerstion placed the mole skin on his skin graft over the open wounds and told him to leave it on as long as he could.  *Id.*

Plaintiff states that on April 30, 2009, he saw Defendant Clark "through a fence at Front Support and told her [that Plaintiff's] shoes were insufficient and that orthotic was causing damage."  Plaintiff's Statement of Facts, pp. 12-13 (pp. 36-37).  He states: "Plaintiff advised [Defendant] Clark she had brought standard width and Dr. Salvador had requested a wider boot."  *Id.*, p. 13 (p. 37).  Plaintiff said that he also needed a "high top boot to help with standing support."  *Id.*  Defendant Clark told Plaintiff to go to sick-call.  *Id.*

On May 1, 2009, Plaintiff was advised by Property Sergeant Daniels that his shoes could be taken because he did not "have a pass."  Plaintiff's Statement of Facts,

p. 13 (p. 37).  Plaintiff showed Sergeant Daniels his property receipt "and she acknowledged that I had just received them."  *Id.*  Despite the acknowledgment, Plaintiff states he filed an informal grievance.  *Id.*  The next day, Plaintiff states that Sergeant Sicarallo asked Plaintiff where he had gotten his shoes.  *Id.*  When Plaintiff said "from Medical," she asked for his pass.  *Id.*  Plaintiff said he had not "been issued a pass but that [he] had a property receipt."  According to Plaintiff, Sergeant Sicarallo told Plaintiff that his "shoes were unauthorized for [that] compound and asked for [his] housing location and bunk number."  *Id.*

Plaintiff returned to sick call on May 4, 2009, requesting a pass for his shoes, ointment and band-aids for his foot.  Doc. 61, p. 9; Ex. C41 (doc. 61-3, p. 47).  He was given Bactrim, six band-aids, and mole skin.  *Id.*  Plaintiff reports Franklin denied his request for a shoe pass, and told him that his "pass had boots on it" and if Security had "a problem, to have them call Medical."  Plaintiff's Statement of Facts, p. 13 (p. 37).  Plaintiff states that his request for pain medication was not addressed.  *Id.*

Plaintiff went back to medical sick-call on May 12, 2009, requesting to see a doctor about "pain medication, muscle rub, and a copy of passes."  Plaintiff's Statement of Facts, p. 13 (p. 37).  He states that Defendant Franklin issued Plaintiff copies of his passes and muscle rub, but told Plaintiff she would talk to the doctor that day about his pain medication.  *Id.*

On May 14, 2009, Plaintiff returned to sick call again complaining about chronic lower back pain and pain in his neck.  Doc. 61, p. 9; Ex. C41A (doc. 61-3, p. 48); *see also* Plaintiff's Statement of Facts, p. 13 (p. 37).  Plaintiff was seen by Ms. Rochelle and Defendant Franklin.  *Id.* and Plaintiff's Statement of Facts, p. 14 (p. 38).  A small cut

was also noticeable on the outer portion of his left foot, but with no signs of infection. Doc. 61, p. 9; Ex. C41B (doc. 61-3, p. 49). Plaintiff was given analgesic balm and told to return in four days if no improvement. *Id.* Plaintiff said that Ms. Rochelle told him he "was being referred to a doctor." Plaintiff's Statement of Facts, p. 14 (p. 38). Plaintiff states that on May 15, 2009, he was given twenty tablets of Ibuprofen, 600 mg. *Id.* Plaintiff states that his pain medication had been decreased "from 60 per month, to 40 per month, to 20 per month [although] pain and damage [had] increased." *Id.*

Plaintiff returned to sick call in four days, May 18, 2009, to be examined by P.A. Salvador for complaints of back pain. Doc. 61, p. 9; Ex. C42 (doc. 61-3, p. 50). Plaintiff was found to have full range of motion, with no swelling or discoloration. *Id.* Plaintiff was prescribed Tegretol for pain relief and P.A. Salvador decided the foot insert should be readjusted due to the development of small open lesions on the pressure points of the left foot. *Id.* Plaintiff's version of this visit reports that when he was on the call-out to see Dr. Salvador on May 18th, "Dr. Salvador stated, 'You almost got me fired. I went through all that trouble and you still write grievances.' " Plaintiff's Statement of Facts, p. 14 (p. 38). Plaintiff took off his shoe to show the open sores, and Dr. Salvador called Defendant Clark "and told her to get [Plaintiff] an appointment with Williams Orthotic/Prosthetic immediately." *Id.* Plaintiff "explained in detail why the shoes they had issued" for him were insufficient. *Id.* Plaintiff also said that he requested an X-ray or MRI for his back pain issue, but Dr. Salvador refused and said to "try Tagrotol [Tegretol] for 90 days and if it did not help to come back." *Id.*

On May 26, 2009, Plaintiff returned to Williams Orthotics for adjustments to the arch support and toe filler.  Doc. 61, p. 9; Ex. C43 (doc. 61-3, p. 51).  It is noted that Plaintiff reported that the adjustments felt good.  *Id.*

On June 1, 2009, another request for a consult to Williams Orthotics was written to readjust the shoe insert due to "developing sores on" Plaintiff's foot.  Doc. 61, p. 9; Ex. C44 (doc. 61-3, p. 52).  Dr. Izuegbu believed that the insert was "ill-fitting."  *Id.*  The Consultant Report as a result of this referral concluded that the "insert just needed some adjusting" and stated that the problem was "coming more from the shoe that he is having to use."  Doc. 61, Ex. C44A (doc. 61-3, p. 53).  There was a recommendation for Plaintiff to have "a stiffer soled shoe that would prevent the forefoot from flexing."  *Id.*  The doctor explained that "[e]very time the forefoot bends it pushes the insert into his foot."  *Id.*  He recommended Plaintiff have a "high top orthopedic boot with stiff soles."  *Id.*

On June 9, 2009, Plaintiff returned to sick call complaining that his "back hurts all the time" and requesting "real pain medication" because he said the medication he was on had "too many side effects."  Doc. 61, p. 10; Ex. C45 (doc. 61-3, p. 54).  Plaintiff had been on 200 mg. of Tegretol which he asserted was not helping the pain.  *Id.*

On June 19, 2009, Plaintiff was referred to the physician and seen by Dr. Izuegbu, seeking change of medications.  Doc. 61, p. 10; Ex. C46 (doc. 61-3, p. 55).  Dr. Izuegbu persuaded Plaintiff to give Tegretol time to work and allowed Plaintiff to have it to take on his own.  *Id.*

Plaintiff was returned to Williams Orthotics on June 22, 2009.  Plaintiff's Statement of Facts, p. 14 (p. 38).  Plaintiff was seen by Randy Williams who told

Plaintiff he would "request a 6" orthotic boot which he felt would be sufficient" for Plaintiff's needs.  *Id*., pp. 14-15 (pp. 38-39).  He advised Plaintiff that "if accepted he would order the boot then bring [Plaintiff] back to fit and adjust the insole."  *Id*., p. 15 (p. 39).

On July 21, 2009, Plaintiff refused to take the prescribed Tegretol.  Doc. 61, p. 10; Ex. C47 (doc. 61-3, p. 56).  The notation in Plaintiff's record of health care states that Plaintiff was scheduled to meet on July 24th "to discuss refusal of Tegretol."  *Id.*

On August 28, 2009, there is a note that Clark contacted Williams Orthotics to check on the status of the new boots.  Doc. 61, Ex. C48 (p. 57).  On the same date, an order was written to take x-rays of Plaintiff's spine due to his complaints of back pain.  Doc. 61, p. 10; Ex. C49 (doc. 61-3, p. 58).  Plaintiff was given Naprosyn (500 mg) and the x-rays were taken on September 8, 2009.  *Id.*  Plaintiff was also advised that the orthopedic shoes were to be delivered the next week.  *Id.; see also* Plaintiff's Statement of Facts, p. 15 (p. 39).  The x-ray results dated September 8, 2009, reflected a normal study with no abnormalities.  Doc. 61, p. 10; Ex. C51 (doc. 61-3, p. 60).

Plaintiff sent another request about his boots on October 14, 2009.  Plaintiff's Statement of Facts, p. 15 (p. 39).  He was advised on October 30th to "watch for call you, you are scheduled to receive in very near future."  *Id.*

On November 2, 2009, Plaintiff received a new pair of size 11 1/2 E PW Minor boots from Williams Orthotics.  Doc. 61, p. 10; Ex. C52 (doc. 61-3, p. 61).  These boots had a stiffer sole and extra depth (larger size) to accommodate the shoe insert and toe filler previously made for Plaintiff.  Doc. 61, p. 10; Ex. H (doc. 61-8, p. 1).  Plaintiff said the new boots "felt great."  Doc. 61, p. 10; Ex. C53 (doc. 61-3, p. 62).  Randy Williams,

a Certified Orthotist, likewise states that Plaintiff "was very pleased the boots took the pressure off the foot . . . ."  Doc. 61, Ex. H (doc. 61-8, p. 1).

Plaintiff states that when he received the boots, they were brown, and size 11½ P.W. boots and minor adjustments were made to the inserts.  Plaintiff's Statement of Facts, p. 15 (p. 39).  Plaintiff asked why the boots were brown instead of black, and "Mr. Williams stated he could have a black pair overnighted to Franklin C.I., but just as Plaintiff was "about to address the issue of [the] wrong size, Sgt. Chambers stated [Plaintiff] would accept those boots because they could not make a return trip the following day."  *Id.*

On November 30th, Plaintiff went to sick call for a renewal of passes and was seen by Defendant Franklin.  Plaintiff's Statement of Facts, p. 39.  She told Plaintiff he could not get the passes until the next week when the doctor was back from court.  *Id.*  Plaintiff assets that he did not receive his pass for the boots and insoles until January 13, 2010.  Plaintiff's Statement of Facts, p. 16, (p. 40).

Defendant Clark submitted an affidavit as the Senior Health Services Administrator.  Doc. 70-1, p. 1 (corrected affidavit).  Defendant Clark states that she does not "have the authority and [she does] not render medical decisions or treatment or make clinical medical judgments."  *Id.*  Her role is to "respond to inmate Request/Informal Grievances as they relate to medical complaints and ensure the responses are in accordance with Department rules and procedures."  *Id.*  She contends that she takes no action or inaction which has "either independently or in conjunction with anyone else to deny or delay his medical treatment or cause him pain and suffering."  *Id.*

After reading an informal grievance from Plaintiff on May 20, 2008, Defendant Clark researched Plaintiff's medical file, and referred the complaint to Dr. Adam.  *Id.* Two days later, Plaintiff had a medical examination on May 22, 2008.  *Id.*  Defendant Clark then responded to Plaintiff's grievance advising him that "sick call was available for any immediate medical issues he may have, that he had been referred to the Reception and Medical Center's Brace Clinic, provided a cane pass, and pain relieving medication " and he should watch for the callout.  *Id.*  Defendant Clark states that when Plaintiff was seen in the Brace Clinic on July 10, 2008, Spot Bilt boots were ordered for him.  Ex. D, doc. 70 (doc. 70-1, p. 2).  When the boots had not been received nor a follow-up appointment scheduled, Defendant Clark called to inquire about Plaintiff's boots.  *Id.*  She was advised that "the company had discontinued the item ordered" for Plaintiff and told his appointment would be rescheduled and "Mr. Lang would be consulted or that the boots could be ordered elsewhere."  *Id.*

Clark further states that on February 10, 2009, Plaintiff sent a grievance complaining about "his foot issues and requested to be provided boots with cushioning." *Id.*  She advised Plaintiff he was scheduled for a callout to see" the doctor and, in fact, Plaintiff "was seen by Dr. Izuegbu on that date . . . ."  *Id.*  "Dr. Izuegbu ordered a pair of athletic shoes for [Plaintiff] on February 27, 2009."  *Id.*  Pursuant to the doctor's order, Defendant Clark "purchased the prescribed shoes in Tallahassee for [Plaintiff], which were then provided to Williams Orthotics for his next appointment."  *Id.*  Defendant Clark reiterates that each time she "responded to" Plaintiff's informal grievances, she "researched his medical record and consulted with and alerted the medical provider when appropriate."  *Id.*

Defendant Ann Franklin also submitted an affidavit in support of Defendants' summary judgment motion.  Doc. 61, Ex. E (doc. 61-5, pp. 1-2).  She is a Senior Licensed Practical Nurse (SLPN) with the Department of Corrections and employed at Franklin Correctional Institution.  *Id.*  Defendant Franklin also denies that she has taken, or failed to take any action "to deny or delay" medical treatment for Plaintiff or cause him pain and suffering.  *Id.*  She denies interrupting Dr. "Moses" [sic, Izuegbu] during his examination of Plaintiff on February 20, 2009, or "attempt to influence his medical assessment or treatment of" Plaintiff.  *Id.*  She has provided medical care to Plaintiff to the best of her medical training and knowledge and has "never been indifferent to [Plaintiff's] medical complaints."  *Id.*

Defendant Bennett-Blake submitted an affidavit as well, stating that in her position as an Advanced Registered Nurse Practitioner, she examined Plaintiff on October 15, 2007, and on March 27, 2008.  Doc. 61, Ex. F (doc. 61-6, pp. 1-2).  During the first examination, Plaintiff reported that he "previously had Timberline boots with diabetic cushions."  *Id.*, p. 2.  She noted Plaintiff's request for special shoes and pain medication in the medical records.  *Id.*  She recommended referring Plaintiff to the Brace Clinic and treated Plaintiff's foot abrasion with Bacitracin and a band-aid.  *Id.*  Plaintiff was also given 600 mg of Motrin for pain.  *Id.*  The following day, on October 16, 2007, Defendant Bennett-Blake initiated the consultation request, which was approved by Dr. Adam.  *Id.*  She states that when Plaintiff was examined at the Brace Clinic on December 14, 2007, he was fitted "for and delivered a pair of Dr. Comfort black high top boots."  *Id.*  When Defendant Bennett-Blake saw Plaintiff again on March 27, 2008, concerning his foot pain, she states that Plaintiff did not appear to be in any distress, but

had a few abrasions on his foot.  *Id.*  She treated the abrasions with bacitracin and a band-aid, and recommended Plaintiff be referred again to the Brace Clinic.  *Id.*  She initiated the consultation request on that same day, and an appointment was set for July 10, 2008.  *Id.*  The purpose of the consultation, states Bennett-Blake, was to evaluate the pain and sores on his foot due to the boots.  *Id.*  Bennett-Blake states that she saw Plaintiff on September 2, 2008, and found Plaintiff had never received the recommended boots.  *Id.*  She initiated a another consult request that same day concerning the boots.  *Id.*  Defendant Bennett-Blake denies that she delayed or denied Plaintiff's medical treatment or caused him pain and suffering.  *Id.*  She avers that she "attempted to ensure that his complaints with his foot [were] addressed."  *Id.*  She "initiated no less than three consults to the Brace Clinic to address his complaints of foot wear and foot pain."  *Id.*

Dr. Moses Izuegbu submitted an affidavit stating that he assisted in providing medical services to inmates at Franklin Correctional Institution from February, 2009, through August of 2009, although he was assigned to another institution during this period.  Doc. 61, Ex. G (doc. 61-7, p. 1).  Dr. Izuegbu states that he "would never allow medical support staff to interfere with [his] medical examinations of patients."  *Id.*  He further states that while he may "contemplate the opinions and observations of medical support staff, especially those who have more familiarity with a patient's issues, this does not detract me from my own professional opinion and diagnosis of the patient's condition."  *Id.*  Dr. Izuegbu further states that he examined Plaintiff's foot on February 20, 2009.  *Id.*  He listened to Plaintiff's complaints about his foot wear, but saw "no injury that needed immediate attention."  *Id.* (doc. 61-7, p. 2).  If Plaintiff had such an injury, it

would have been addressed and documented in the medical record.  *Id.*  Dr. Izuegbu

initiated a consult for Plaintiff to be examined in the Brace Clinic.  *Id.*  Dr. Izuegbu

concludes:  "No medical support staff interfered with [his] examination of" the Plaintiff.

*Id.*

Plaintiff submitted his own declaration in opposition to Defendants' motion for

summary judgment.  Doc. 66, Declaration, pp. 1-2 (p. 18-19).  Plaintiff avers that he

entered the Department of Corrections custody with "a pre-existing amputation of over

50% of his left foot, including big toe, 2nd toe and an extensive, extremely sensitive skin

graft covering the amputated area which consists of the entire inside and over half of

what remains on top and bottom of foot."  *Id.*, p. 1 (p. 18).  Plaintiff avers that: "the

muscle and skin have deteriorated and the bone is close to protruding from skin, due to

having no padding in shoes, no prosthetic insert to keep the shoe from rubbing against

the affected area."  *Id.*, pp. 1-2 (pp. 18-19).  Plaintiff states that his "posture, balance,

and locomotion are significantly impaired" as a result of the "major loss of muscle,

tissue, and bone, as well as the numerous sensitive skins [sic] grafts . . . ."  *Id.*, p. 1 (p.

18).  He states:  "Plaintiff had pre-molded prosthetic foot inserts that were medically

prescribed and top quality padded boots that provided protection and balance until"

entering prison "at which time they were taken and disposed of by an un-named officer

without medical consent."  *Id.*  Plaintiff avers that he was "denied his prosthetic aids for

over a year."  *Id.*  As a consequence, he is "extremely more handicapped and has

suffered open wounds to skin grafts . . . "  *Id.*  Plaintiff further avers that he has

"experienced chronic severe pain in his lower back and knee, all on this right side due to

the twisted posture that the locomotion necessitated."  *Id.*, p. 2 (p. 19).  Plaintiff states

that he must walk anywhere he goes and "has been forced to stand in lines for long periods of time." *Id.* Plaintiff contends he has also suffered from anxiety and depression, afraid of "losing the rest of his foot due to infection, which is excessively common in the prison system." *Id.* Plaintiff explains that he had "over a year long paper dialogue" with Defendants and D.O.C. trying to "allow them the opportunity to correct this wrong." *Id.*

Plaintiff also submitted an affidavit in which he complains that Defendants have caused "permanent irreversible damage to the skin graft on [his] partially amputated left foot, and have cause[d] [him] unjustifiable pain and suffering." Doc. 66, Affidavit, p. 1 (p. 21). Plaintiff avers that during this "ordeal, Plaintiff repeatedly accessed medical for treatment." *Id.*, p. 2 (p. 22). Plaintiff asserts that his efforts were "either passed-off or met with meaningless and completely non-responsive band-aids and ointment which did nothing whatsoever to alleviate the problem." *Id.* Plaintiff also contends that in the "prior 18 years of prosthetic use, Plaintiff never once suffered injury to the amputated area." *Id.* Plaintiff asserts that Defendants refused to treat Plaintiff's amputation as a serious medical need and argues that instead of providing medical assistance to Plaintiff, they just issued him band-aids. *Id.*

**Analysis**

Deliberate indifference to the serious medical needs of sentenced prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). A "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention." Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994),

abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153

L.Ed.2d 666 (2002), *quoting* Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D. N.H.

1977).  Alternatively, "a serious medical need is determined by whether a delay in

treating the need worsens the condition" or "if left unattended, poses a substantial risk

of serious harm."  Mann v. Taser Intern., Inc., 588 F.3d 1291, 1307 (11th Cir. 2009),

*citing* Hill, 40 F.3d at 1188-89, and Farrow v. West, 320 F.3d 1235, 1243 (11th Cir.

2003).

The concept of deliberate indifference entails something more than negligence,

but is satisfied by something less than actions undertaken with an intent to cause harm.

Farmer v. Brennan, 114 S. Ct. 1970, 1978 (1994).  Subjective recklessness, as defined

in criminal law, is the standard which must be shown for an official's actions to rise to

the level of deliberate indifference.  *Id*. Deliberate indifference has been described as a

culpable state of mind of the defendant to unnecessarily and wantonly inflict pain or

harm to a prisoner by depriving him of a basic human need.  Wilson v. Seiter, 501 U.S.

294, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

Combining the standards from Farmer and Estelle, the Eleventh Circuit has

clarified that, ultimately, there are four requirements to bringing an Eighth Amendment

claim for the denial of medical care: "an objectively serious need, an objectively

insufficient response to that need, subjective awareness of facts signaling the need, and

an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d

1254 (11th Cir. 2000), *cert. denied* 531 U.S. 1077 (2001); Farrow v. West, 320 F.3d

1235, 1243 (11th Cir. 2003).  Put another way, once a prisoner shows that he has a

serious medical need, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004), *citing* McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999).

Medical malpractice does not constitute deliberate indifference. Estelle, 429 U.S. at 106, 97 S. Ct. at 292. "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991), citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989). *See also* Johnson v. Stephan, 6 F.3d 691, 692 (10th Cir. 1993). For example, in Estelle, the prisoner received treatment for his back injury (bed rest, muscle relaxants and pain relievers), but complained that more should have been done in the way of diagnosis, such as an X-ray or other tests. The Court rejected this as a basis for liability:

> But the question whether an X-ray--or additional diagnostic techniques or forms of treatment--is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

429 U.S. at 107, 97 S. Ct. at 293. "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill, 40 F.3d at 1187.

Not responding at all to complaints of pain can be an Eighth Amendment violation and qualified immunity is unavailable. McElligott v. Foley, 182 F.3d 1248 (11th

Cir. 1999).  In McElligott, the court held that "a jury could find that the medication

provided to [the prisoner] was so cursory as to amount to no care at all."  McElligott, 182

F.3rd at 1257.  Where a defendant is aware that the pain medication provided is not

treating the prisoner's pain, and does nothing more to treat that pain or respond to a

deteriorating condition, a jury could find that defendant violated the Eighth Amendment.

An "official acts with deliberate indifference when he or she knows that an inmate is in

serious need of medical care, but he fails or refuses to obtain medical treatment for the

inmate." McElligott, 182 F.3d at 1255, citing Lancaster v. Monroe County, Ala., 116

F.3d 1419, 1425 (11th Cir. 1997); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir.1989).

A prisoner's medical need may be found to be serious if the failure to treat the

condition could result in significant further injury or an unnecessary infliction of pain.

McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992).  Routine discomfort does not

qualify as a serious medical need.  Id.  Further, when an inmate has received some

medical attention or care and the dispute involves the adequacy of the care, federal

courts are reluctant to second guess medical judgments and find an eighth amendment

violation.  Harris v. Thigpen, 941 F.2d 1495, 1507 (11th Cir. 1991).  As stated in

McElligott, "[h]esitation does not mean, however, that the course of a physician's

treatment of a prison inmate's medical or psychiatric problems can never manifest the

physician's deliberate indifference to the inmate's medical needs" 183 F.3d at 1259,

citing Waldrop, 871 F.2d at 1035.  Thus, liability cannot be avoided simply by pointing

out that some medical care was provided, however cursory or insufficient that care.

Defendants argue that the evidence shows that Plaintiff did not have a serious

medical need and only had small, reddened or small opened areas on his foot.  Doc. 61,

p. 15.  Defendants point out that there is no evidence the small lesions or reddened

areas became infected.  *Id.*  This argument is not persuasive.  Plaintiff's affidavits

provide evidence that he has a permanent and serious foot injury.  He has provided

evidence that a bone is close to the surface of his deformed foot, that the skin graft is

delicate and in danger of permanent damage without suitable boots, and that without

suitable boots, he suffers serious chronic pain.

Defendants also argue that the evidence does not show that they were

deliberately indifferent to Plaintiff's serious medical need.  Doc. 61, p. 15.  They note the

evidence reveals he received treatment on numerous occasions for his problems, and

was given pain medication and numerous types of foot wear to address his complaints.

*Id.*  Defendants suggest Plaintiff has merely presented a case of a difference of opinion

between himself and his medical providers.  *Id.*, pp. 15-16.  They specifically address

the lack of evidence of deliberate indifference as to each.  *Id.*, pp. 16-20.  These will be

addressed as to each Defendant.

**Clark**

Defendant Clark is a health care administrator, not a health care provider.

Plaintiff merely alleges that Clark had "actual knowledge of the damage caused to the

Plaintiff and has denied and delayed adequate medical treatment for Plaintiff's serious

medical needs."  Doc. 21, p. 7.  Plaintiff provided no further specifics in his complaint or

in his response to her motion for summary judgment.

As recounted above, Plaintiff was seen by Clark on May 28, 2008.  Plaintiff's

Statement of Facts, p. 5 (p. 29).  Clark looked into Plaintiff's file, discovered that there

had not been a referral yet to the Brace Clinic, and she inquired using her computer.  *Id.*

She received a message and then told Plaintiff that he would receive an appointment at the Brace Clinic very soon, but could not tell him exactly when.  *Id.*, pp. 5-6 (pp. 29-30).

On September 18, 2008, Clark contacted Advance Brace to inquire about Plaintiff's boots.  Doc. 61, p. 7; Ex. C22 (doc. 61-3, p. 24).  Clark was advised that Spot-Bilt boots had been discontinued by the company.  *Id.*  An appointment for Plaintiff would be rescheduled and they would possibly order Plaintiff's boots elsewhere.  *Id.*  Another phone call was made to the Brace Clinic on September 24th to request a follow-up appointment for Plaintiff at the Brace Clinic.  *Id.*; *see also* Doc. 61, Ex. D (doc. 61-4, p. 1) (hereinafter "Clark Affidavit").

On February 27, 2009, Dr. Izuegbu ordered a pair of athletic shoes for Plaintiff.  Doc. 61, p. 8; Ex. C34B (doc. 61-3, p. 39).  Clark herself purchased the footwear for delivery to Plaintiff at his next orthotics appointment.  Doc. 61, p. 8; Doc. 70, Ex. D (corrected affidavit) (doc. 70-1, p. 2).

On March 2, 2009, Clark told Plaintiff that she was ordering "a pair of size 11.5 Redwing high-top boots," and told Plaintiff that the boots would arrive on March 4, 2009, but he would not receive them until the prosthetic inserts were made.  Plaintiff's Statement of Facts, p. 11 (p. 35).  She also advised that the boots would be "delivered to an orthopedic specialist to insure a proper fit."  *Id.*  Plaintiff avers that he thanked Defendant Clark for helping him with the treatment, and she replied, "Thank the State, they're paying for it; and because of the expense, you can only receive new ones every 4 years."  *Id.*  Plaintiff states that two days later, on March 4th, Plaintiff saw Defendant Clark in the hall talking to Dr. Salvador.  *Id.*  She had a boot box with the Redwing logo on the box.  *Id.*  He did not receive these boots.  Instead, on March 20, 2009, he was

transported to the Williams Orthopedic Prosthetic Clinic in Tallahassee "with a pair of Merrell Hiking Boots."  Plaintiff's Statement of Facts, p. 11 (p. 35).  Plaintiff's foot was "inspected, photographed, and molded for replacement orthopedic prosthetic inserts." *Id.*  There is no evidence that Clark had anything further to do with the decision to prescribe these particular boots.  There were problems fitting the prosthetic inserts not connected to Clark, but ultimately Plaintiff received the Merrell boots on April 24, 2009, and he told the Williams clinic that they felt good.  Plaintiff's Statement of Facts, pp. 11-12 (pp. 35-36); Doc. 61, p. 8; Exs. C36-C39 (doc. 61-3, pp. 41-45).

On April 30, 2009, Plaintiff states that he saw Defendant Clark "through a fence at Front Support and told her [that Plaintiff's] shoes were insufficient and that orthotic was causing damage."  Plaintiff's Statement of Facts, pp. 12-13 (pp. 36-37).  He states: "Plaintiff advised [Defendant] Clark she had brought standard width and Dr. Salvador had requested a wider boot."  *Id.*, p. 13 (p. 37).  Plaintiff said that he also needed a "high top boot to help with standing support."  *Id.*  Defendant Clark told Plaintiff to go to sick-call.  *Id.*  On August 28, 2009, there is a note that Clark contacted Williams Orthotics to check on the status of the new boots.  Doc. 61, Ex. C48 (p. 57).

I have not recounted here the evidence from Defendant Clark from her own affidavit, all of which is favorable to her defense.  None of the record evidence concerning Clark recited above supports an Eighth Amendment claim against Clark. Clark actively tried to help Plaintiff on every occasion in which she was personally involved.  She was not deliberately indifferent to Plaintiff's serious medical needs. Summary judgment should be granted in favor of Clark.

**Bennett-Blake**

Plaintiff alleges in his complaint that Bennett-Blake saw him on *March* 14, 2008, at the request of Dr. Adam.  Doc. 21, p. 6.  He alleges that Bennett-Blake examined his foot, and then told Dr. Adam that Plaintiff had already been sent to the Brace Clinic and "was not eligible for new boots for one (1) year." *Id.*  He also alleges that she advised Dr. Adam not to x-ray Plaintiff's foot because the injury did not happen in the Department of Corrections.  *Id.*  He argues that from May 22, 2008, forward, Dr. Adams refused to treat Plaintiff's foot.  *Id.*  He argues that these actions delayed treatment causing deterioration of his skin graft and back problems.  *Id.*  This is Plaintiff's only claim against Defendant Bennett-Blake.

As Defendants note, there is no notation in Plaintiff's medical record that Bennett-Blake saw him on March 14, 2008, and suggest that perhaps Plaintiff means February 14, 2008.  Doc. 61, p. 17.  That is a fair reading of the complaint, as Plaintiff corrects this claim in his Statement of Facts discussed above.

There are two factual allegations here with respect to the February 14, 2008, encounter with Nurse Practitioner Bennett-Blake.  Plaintiff alleges that she told Dr. Adams that he could not go back to the Brace Clinic for refitting of his shoes for a year and he had to "deal with it" for a year, and he alleges that she told Dr. Adams that he should not have his foot x-rayed because the injury occurred before he was received by the Department of Corrections.  Plaintiff's Statement of Facts, p. 3 (p. 27).

Plaintiff has not shown that the cancellation of the x-ray of the foot caused him any harm because he has not shown how an x-ray was needed to provide treatment.  As was the case in Estelle v. Gamble, a claimant's argument about the necessity for an x-ray simply does not state an Eighth Amendment claim.

It is undisputed that Defendant Bennett-Blake examined Plaintiff again on March 27, 2008, and initiated another request that he be sent again to the Brace Clinic for further evaluation.  Doc. 61, p. 5; Exs. C15 and C16 (doc. 61-3, pp. 15-16).  It is also undisputed that Defendant Bennett-Blake promptly initiated two other requests for evaluation of Plaintiff's foot needs at the Brace Clinic, the first on October 15, 2007, and the third on September 2, 2008.  Doc. 61, pp. 3-4; Exs. C5 and C6 (doc. 61-3, pp. 5-6) and Exs. C20 and C21 (doc. 61-3, pp. 21-22).

But this court must assume that Plaintiff's evidence is true, that Nurse Practitioner Bennett-Blake told Dr. Adam that Plaintiff could not go back to the Brace Clinic for a year and no request was initiated on that date.  It is undisputed that on March 27, 2008, Bennett-Blake initiated another request that Plaintiff return to the Brace Clinic.  Considering the evidence in a light most favorable to Plaintiff, a request to send Plaintiff back to the Brace Clinic could have been initiated by Bennett-Blake on February 14, 2008.  The delay, about 6 weeks, is not insignificant, given Plaintiff's allegations of pain, inability ambulate, and damage to his skin graft.[9]  Summary judgment should be denied as to Defendant Bennett-Blake as to this very narrow claim of delay of treatment.

---

[9] Admittedly there is a lot of contrary evidence, but the evidence simply creates a genuine dispute of material fact.

**Franklin**

Franklin is a Senior Licensed Practical Nurse.  Plaintiff alleges in his amended complaint, filed on May 26, 2009, that on February 20, 2009, while he was examined by Dr. Izuegbu, Franklin "did interrupt the examination being performed and soundly advised Dr. [Izuegbu] that the issue Plaintiff was addressing (damage to skin graft) had already been taken care of and that the examination was complete."  Doc. 21, p. 7.  Plaintiff alleges that Franklin therefore denied and delayed treatment for him.  *Id*.

Franklin asserts that Plaintiff failed to exhaust his administrative remedies as to this claim.  Doc. 61, p. 16.  Franklin has the burden of proof.[10]  Franklin argues that Plaintiff's grievances occurred in 2008, before this event occurred.  *Id*., p. 17.  Submitted in support of this defense are grievances from 2008.  *Id*., Ex. I.  Franklin has not presented evidence that there are no grievances after February 20, 2009, that grieve this claim.  Since Defendant has not presented evidence in support of this defense, this argument is not persuasive.

Franklin also argues that there is no evidence that she interrupted medical treatment being provided to Plaintiff or interfered in any way.  Doc. 61, p. 17.  Moreover,

---

[10] Defendants "bear the burden of proving that the plaintiff has failed to exhaust his available administrative remedies."  <u>Turner v. Burnside</u>, 541 F.3d 1077, 1082-83 (11th Cir. 2008), *relying on* <u>Jones v. Bock</u>, 549 U.S. 199, 127 S.Ct. at 910, 921, 166 L.Ed.2d 798 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.");  <u>Dixon v. United States</u>, 548 U.S. 1, 8, 126 S.Ct. 2437, 2443, 165 L.Ed.2d 299 (2006) (stating that, as a "general evidentiary rule," the burdens of production and persuasion are given to the same party);  <u>Roberts v. Barreras</u>, 484 F.3d 1236, 1240 (10th Cir. 2007) ("<u>Jones</u> does not spell out the proper burden of proof to use in evaluating exhaustion claims, but circuits that treated exhaustion as an affirmative defense prior to <u>Jones</u> have all put the burden of proof on defendants, to the extent that they addressed the issue.").

she argues that claim fails because even if true, no harm came to Plaintiff as Dr. Izuegbu wrote a new consult request to the Brace Clinic and also changed orthotics providers for Plaintiff.  *Id.*

The evidence concerning the February 20, 2009, visit to Dr. Izuegbu and Franklin is set forth in greater detail above.  The findings of Dr. Izuegbu on February 20, 2009, show that Plaintiff had a serious medical need on that day.  Dr. Izuegbu found that Plaintiff had a need for a custom molded shoe with an insert to protect the skin and deter breakdown due to "paper thin skin (skin irritation) skin graft area."[11]  Doc. 61, Ex. C34 (doc. 61-3, p. 37).  Dr. Izuegbu found Plaintiff "had difficulty in maintaining his balance" and he had "developed back pain due to standing on" his right leg most of the time to keep his weight of the left foot.  *Id.*   Yet Plaintiff has presented evidence that Franklin denied or caused a denial of a walking cane, a "no prolonged standing" pass, and Ibuprofen.[12]  Plaintiff's Statement of Facts, p. 9 (p. 33).

That Plaintiff seems to have needed a cane and was in severe pain on February 20, 2009, is confirmed by the findings of Dr. Salvador just five days later (on February 25, 2009). Doc. 61, p. 8; Ex. C33 (doc. 61-3, p. 36).  Dr. Salvador said that Plaintiff was "presenting a problem with balance maintenance due to severe pain" in left foot when standing and bearing weight.  *Id.*  A cane would have been helpful with balance and to

---

[11] The consultant wrote on September 10, 2009: "Inmate has a grossly deformed Lt. Foot that requires *immediate* attention for proper balance and skin breakdown prevention."  Doc. 61, Ex. C34A (doc. 61-3, p. 38) (emphasis added).

[12] Denial of pain medication seems to have continued.  Plaintiff went back to medical sick-call on May 12, 2009, requesting to see a doctor about "pain medication, muscle rub, and a copy of passes."  Plaintiff's Statement of Facts, p. 13 (p. 37).  He states that Defendant Franklin issued Plaintiff copies of his passes and muscle rub, but told Plaintiff she would talk to the doctor that day about his pain medication.  *Id.*

alleviate severe pain.  Further, Plaintiff has presented evidence that just five days later

Dr. Salvador told him that he needed a walker.  Plaintiff's Statement of Facts, p. 10 (p.

34).  Dr. Salvador also issued a low bunk pass and issued the no prolonged standing

pass that Franklin denied.  Doc. 61, p. 8; Ex. C33 (doc. 61-3, p. 36).  In summary, as to

the encounter with Franklin on February 20, 2009, Plaintiff has presented a genuine

dispute of material fact, and summary judgment in favor of Franklin as to that narrow

claim should be denied.

**Eleventh Amendment Immunity**

If this report and recommendation is adopted, there will be only two very specific

claims pending against Defendants Bennett-Blake and Franklin.

Defendants had generally asserted their entitlement to Eleventh Amendment

immunity as to Plaintiff's claims against them in their official capacities for money

damages.  Doc. 61, pp. 10-11.  Plaintiff asserts, without a legal basis, that Defendants

are not entitled to Eleventh Amendment immunity, but that is incorrect.  The law is clear

that absent limited exceptions, the State of Florida and its agencies are immune from

suit in this Court by force of the Eleventh Amendment.  Carr v. City of Florence,

Alabama, 916 F.2d 1521, 1524 (11th Cir. 1990).  A suit under § 1983 against either the

state or an agency of the state is absolutely barred by the Eleventh Amendment unless

it meets one of three exceptions.  The first two exceptions are through a waiver of

sovereign immunity.  *See* Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 105

S. Ct. 3142, 87 L. Ed. 2d 171 (1985); Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683,

40 L. Ed. 2d 90 (1974); Gamble v. Florida Dept. of Health and Rehab. Servs., 779 F.2d

1509 (11th Cir. 1986).  Waiver may be either by the State or Congress may override a

state's immunity pursuant to its power under § 5 of the Fourteenth Amendment. Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank, 527 U.S. 627, 119 S. Ct. 2199, 2205-06, 144 L. Ed. 2d 575 (1999); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996).  In enacting § 1983, Congress did not abrogate a state's immunity.  Quern v. Jordan, 440 U.S. 332, 99 S. Ct. 1139, 59 L. Ed. 2d 358 (1979); Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974).  Neither has Florida waived its Eleventh Amendment sovereign immunity and consented to suit in federal court under § 1983.  Gamble, 779 F.2d at 1520.

The third remaining exception to this constitutional bar is through Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908).  See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 269, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997) (reaffirming that prospective relief may be sought against a state official in federal court); Sandoval v. Hagan, 197 F.3d 484, 492 (11th Cir. 1999), citing Summit Medical Assoc. v. Pryor, 180 F.3d 1326, 1336-38 (11th Cir. 1999).  This long-standing doctrine was explained by the Court as follows:

> The doctrine of Ex parte Young, which ensures that state officials do not employ the Eleventh Amendment as a means of avoiding compliance with federal law, is regarded as carving out a necessary exception to Eleventh Amendment immunity.  Moreover, the exception is narrow:  It applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, and has no application in suits against the States and their agencies, which are barred regardless of the relief sought. Rather than defining the nature of Eleventh Amendment immunity, Young and its progeny render the Amendment wholly inapplicable to a certain class of suits.  Such suits are deemed to be against officials and not the States or their agencies, which retain their immunity against all suits in federal court.

Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 146,

113 S. Ct. 684, 688-89, 121 L. Ed. 2d 605 (1993) (internal citations omitted).

Therefore, Plaintiff's claims against Bennett-Blake and Franklin in their official

capacities for monetary damages are barred.

**Injunctive Relief**

Defendants contend that Plaintiff's request against them in their official capacities

for injunctive relief to be provided "specialized foot wear" is moot because Plaintiff was

happy with the shoes he received on November 2, 2009.  Doc. 61, p. 11.  Plaintiff,

however, states in his response to the motion for summary judgment that he seeks size

10 1/2 boot with adequate cushioning on the tongue and sides to protect his skin graft,

orthotic inserts for standing balance and support, proper medical passes, and corrective

surgery to repair the damage to his skin graft.  Doc. 66, p. 2.  Plaintiff did not specify the

size of the boot sought in his complaint, however.  Doc. 21.  The shoes Plaintiff last

received, in November, 2009, were 11 1/2, which would be a size too large, at least

based on the prior sizes given to Plaintiff.  Plaintiff contends that the size was increased

by Dr. Salvador to "compensate for the insert, but the insert is custom molded to make

up for the part of the foot that is missing."  Doc. 66, p. 6.  Plaintiff says the "oversize is

forcing [him] to tie the boots too tight cutting off adequate blood flow causing further

damage and discomfort)."  *Id.*

If Plaintiff has received an improper shoe size, then the request for injunctive

relief is not moot, at least as to some Defendant, and it cannot be said on this record

that a size 11 1/2 boot was the proper size.  Moreover, Plaintiff has also requested

surgery to repair the damage to his skin graft.  Furthermore, Plaintiff states that he will

require "special shoes for his entire commitment" and seeks to guarantee that such relief will continue.  The requests for injunctive relief (as argued) are not moot as argued.

Still, no remaining and served Defendant has the official capacity to provide the equitable relief sought.  Adams and the John Doe Defendant cannot be found and have not been served.  The status of claims against Coleman is unknown.  No claims should remain against Clark, and the claims against Bennett-Blake and Franklin are very limited.  Plaintiff does not seek injunctive relief against Franklin for a cane, a no prolonged standing pass, and Ibuprofen, and it his highly doubtful that she could provide the other relief sought.  Likewise, he does not seek referral to the Brace Clinic from Defendant Bennett-Blake.  Indeed, after the February 14, 2008, encounter, Bennett-Blake referred Plaintiff to the Brace Clinic several times.  Claims for equitable relief against Bennett-Blake and Franklin should be dismissed for these reasons.

### ADA Claim

While Defendants address an ADA claim, doc. 61, pp. 11-12, Plaintiff clarifies that he did not intend to bring an ADA claim.  Doc. 66, p. 3.  This aspect of Defendants' motion for summary judgment is moot.

### Qualified Immunity

Defendants conclude by asserting a qualified immunity defense.  Doc. 61, p. 20. The only remaining claim is the narrow ones against Bennett-Blake and Franklin, and this defense must be applied to those claims.

It has long been established that knowledge of the need for medical care and intentional refusal to provide that care constitute a constitutional violation.  *See, e.g.*,

Mandel v. Doe, 888 F.2d 783, 788 (11th Cir. 1989).  Furthermore, intentional or

unexplained delay in the treatment of serious and painful injuries was clearly recognized

as rising to the level of a constitutional claim well prior to 2007 when Plaintiff entered

custody.  *See* Brown v. Hughes, 894 F.2d 1533, 1537-39 (11th Cir.), *cert. denied,* 496

U.S. 928 (1990), *citing* Estelle, 429 U.S. at 104, 97 S.Ct. at 291; Thomas v. Town of

Davie, 847 F.2d 771, 772-73 (11th Cir. 1988); Ancata v. Prison Health Services, Inc.,

769 F.2d 700, 704 (11th Cir. 1985); H.C. by Hewett v. Jarrard, 786 F.2d 1080, 1087

(11th Cir. 1986).  The defense of qualified immunity against an award of money

damages in personal capacity is unavailable to Bennett-Blake or Franklin as to the

narrow claims remaining.

**Conclusion**

Accordingly, it is **RECOMMENDED** that  Defendants' motion for summary

judgment, doc. 61, be **GRANTED** as to all claims against Defendant Clark, all claims for

equitable relief against Bennett-Blake and Franklin, and all claims against Bennett-Blake

or Franklin for monetary damages in their official capacities, but **DENIED** as to the claim

regarding denial of a referral to the Brace Clinic by Bennett-Blake on February 14, 2008,

and **DENIED** as to the claim against Defendant Franklin with respect to denial of

Ibuprofen, a cane, and a no prolonged standing pass, on February 20, 2009**.**  It is

further recommended that the case be **REMANDED** to me for further proceedings.

IN CHAMBERS at Tallahassee, Florida, on May 10, 2010.


 s/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**